## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Seth Thompson, being duly sworn, state as follows:

## INTRODUCTION AND BACKGROUND

1. I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI), and have been since December 2009. I attended the Federal Law Enforcement Training Center in Glynco, GA where I received investigative training in areas including, but not limited to, narcotics smuggling, human smuggling/trafficking, money laundering, and financial investigations. During my employment as a Special Agent, I have participated in investigations involving, but not limited to, narcotics smuggling/trafficking, money laundering, firearms, financial fraud, and counterproliferation. During these investigations, I have participated in surveillance operations, interviews of witnesses and cooperating sources, and examined and analyzed various forms of evidence to include electronic data. These investigations have led to the arrest and prosecution of subjects as well as the seizure of narcotics, currency, firearms, and real property.

2. HSI Office of the Assistant Special Agent in Charge, Memphis, TN is responsible for the Western District of Tennessee.

3. I submit the Affidavit based on information from my own investigative findings as well as information obtained from others who have investigated this matter and/or have personal knowledge of the facts herein. In have not included all the facts of this case affidavit, only those necessary to support the issuance of an arrest warrant.

4. This Affidavit contains probable cause that Moulay Mohamed Boufous ("Boufous") did commit the offense of smuggling in violation of Title 18, United States Code, Section 554 and

conspiracy to commit that offense in violation of Title 18, United States Code, Section 371 and I respectively request that the court issue an arrest warrant.

**FACTS IN SUPPORT OF PROBABLE CAUSE**

5. In early 2024, HSI, Federal Bureau of Investigations, and Bureau of Industry and Security ("BIS"), Office of Export Enforcement began investigating Malak Aircraft Spare Parts Company ("Malak") and its owner, Boufous. It was believed that Malak, under the control of Boufous, was illegally exporting commercial aircraft parts manufactured in the United States ("US") to Russia in violation of current sanctions.

6. Malak is located in Dubai, United Arab Emirates and is believed to have been in operation between late 2022 to at least April 2025. Boufous is a national of Morocco believed to be currently residing in Dubai.

7. Agents were able to verify through both public records and Customs and Border Protection ("CBP") export records that Malak was an active aircraft parts supplier based in Dubai. The CBP records contained approximately 90 instances in which aircraft parts were sent from companies located in the United States to Malak in Dubai. It should be noted that CBP only maintains export records of shipments requiring an export license or shipments valued at over $2,500. Agents also confirmed that Boufous is a Moroccan citizen residing in Dubai.

8. In April 2024, Boufous travelled to the United States where he was inspected and interviewed by Customs and Border Protection ("CBP") officers upon his arrival. During the interview, Boufous stated he was the owner of an aircraft parts company called Air Med Aviation and that he had previously owned Malak until he sold it in December 2023 to an individual named Mohamed Aaouchai ("Aaouchai").

9.      When asked about foreign travel, Boufous told CBP officers that he had previously travelled to Russia on five different occasions.  He stated each of these trips had been for pleasure and that he has never conducted business with any Russian companies.

10.     As part of his entry inspection upon arriving in the United States, CBP officers downloaded the content of a smart phone that was in his possession.  Agents were able to review this content and found evidence that Malak was involved in selling aircraft parts to Russia contrary to Boufous' statements to CBP officers.  Furthermore, agents found evidence that Malak's email domain, malakaviation.aero, was being used to facilitate this activity. Agents also found numerous WhatsApp messages discussing the purchase, sale, and transfer of aircraft parts from United States parts suppliers to known aviation-related companies located in Russia.  These messages also revealed a suspected Russian citizen believed to be residing in Russia working as an employee of Malak and utilizing a malakaviation.aero email address.

11.     In April 2025, a search warrant for the malakaviation.aero email domain was granted in United States District Court, Western District of Tennessee.  The information returned from this search warrant included the content of several email accounts belonging to departments and individual employees of Malak.

12.     A review of the Malak email accounts found evidence that Boufous had been the 100% owner of Malak from at least late 2022 until he claimed he sold the business in December 2023.  Additionally, it was found that Boufous had held the position of Malak's CEO during this period as well.

13.     This review also determined that email address m.moulay@malakaviation.aero was used by Boufous to send and receive messages while he owned and operated Malak.  To date, agents

have found no evidence that any other person used or controlled this email address other than Boufous.

14.     A November 30, 2023 email sent by m.moulay@malakaviation.aero was found to contain an attached commercial license for Malak Aircraft Spare Parts Trading Co that had been issued by the Government of Dubai on October 21, 2022.  This document listed "Moulay Mohamed Boufous" as both the "100% Shares Owner" and the "Manager" of Malak.  The document also listed Boufous' email address as "m.moulay@malakaviation.com".

15.     Agents also discovered an email sent on January 27, 2023 by an employee of Malak to a representative of Utair, a Russia-based airline company.   The email address m.moulay@malakaviation.aero also received the email as a carbon copy.  The email discussed a new partnership between Malak and Utair and was found to contain an attached questionnaire that had been completed by Malak.  In the questionnaire, "Moulay Mohamed Boufous 09/11/1992" was listed in response to the question regarding Malak's "CEO".  November 9, 1992 is Boufous' date of birth according to several records including US Department of Homeland Security records. Additionally, "Moulay Mohamed Boufous" was listed in response to the question regarding Malak's "Owner / Shareholder".

16.     A review of the email accounts did find documents related to Aaouchai's eventual ownership of the company, including a business license and a November 2023 share certificate showing Aaouchai's 100% ownership of Malak.  However, agents discovered considerable evidence that strongly demonstrated Boufous' continued control of Malak beyond the date he claimed to have sold the company.

17.     On February 14, 2024, in response to a customer complaint,

m.moulay@malakaviation.aero sent an email message stating *"Hello, As the General Manager of Malak Company, we extend our apologies to you for the delay and for any inconvenience we caused you"*.

18. On May 31, 2024, an employee of Malak sent an email to m.moulay@malakaviation.aero and lalla.meryem@malakaviation.aero containing the message *"Dear Managers, Rinat from ND1 has just called and requested that we proceed with this Purchase Order urgently, the payment is in progress."* ND1 is Malak's internal code for a Russia-based airline company called Nordstar.

19. On July 23, 2024, an email message was sent from an employee of Malak to m.moulay@malakaviation.aero that stated *"Dear Moulay. I hope your well, We are facing some challenges to submit declaration to Dubai customs. Kindly provide all documents to the finance department so we can submit the request"*.

20. On January 15, 2025, m.moulay@malakaviation.aero sent an email discussing problems receiving emails. Before and after this message, m.moulay@malakaviation.aero sent three different emails to moulaymohamedboufous@gmail.com, each time with the subject line of "test". A similar message had been sent on November 28, 2022 between m.moulay@malakaviation.aero and moulaymohamedboufous@gmail.com that also contained the subject line "test". Agents discovered a document from 2023 that listed moulaymohamedboufous@gmail.com as an email address belonging to Boufous.

21. On March 4, 2025, viktor.sukhov@flypobeda.ru sent an email message to m.moulay@malakaviation.aero stating *"Hello Moulay, We have received approval from our security department and can proceed with the contract now."* On the same day,

m.moulay@malakaviation.aero responded to the email with *"We will review and sign the contract within 48 hours"*.

22. Contrary to Boufous' claim he had never done business with any Russian companies, agents found countless examples of Boufous and Malak not only doing business with Russia but also selling US-made aircraft parts to Russia.

23. On February 28, 2023 m.moulay@malakaviation.aero sent an email to a representative of S7 Airlines, a Russia-based airline company, regarding the signature of an attached document. The document was a letter of intent in which S7 would agree to purchase a US-made aircraft engine from Malak.

24. On April 9, 2023, the following email was sent from an employee of Malak to m.moulay@malakaviation.aero and lalla.meryem@malakaviation.aero requesting them to respond to a customer. The email stated *"...he has many connections with Russian companies who have problems with the supply of engines for their Boeing because of sanctions. Could you please evaluate the price for buying and delivery to Russia, Moscow the following items:"*

25. On April 10, 2023, m.moulay@malakaviation.aero responded to the message with the following *"We already have relationships with all the Russian companies mentioned in the email, we also have a representative of our company in Russia..."*

26. During this investigation, agents found evidence of numerous instances during 2023 and 2024 in which Malak acquired US-made parts and subsequently sent those parts to Russia. It is believed that Malak did not obtain authorization from the US Government to export these parts to Russia. In the following instance, agents were able to determine that Malak sent a US-made aircraft part to Russia in which a required license was not obtained and the part was found to have

transited the Western District of Tennessee.

27. Between January 10, 2024 and March 17, 2024, Malak and Pobeda Airlines, a Russia-based airline, conspired to export a US-made aircraft part from the United States to Russia in violation of current US sanctions against Russia.

28. On January 10, 2024, a representative of Pobeda Airlines requested a quote from Malak via email regarding the availability and price of two aircraft escape slides, designated as part number 5A3307-701. This was quickly followed by several emails from Malak to US companies requesting quotes for the same part number. On the same day, a representative of Atlantic Jet Support ("AJS"), an aviation part supplier located in Coconut Creek, Florida, responded to Malak stating they had one such part in stock.

29. On February 1, 2024 an email was sent from Malak to AJS agreeing on the purchase price of $39,000 for a single 5A3307-701. On February 19, 2024, an email was sent from WIO Bank to Malak confirming that a payment of $39,050 had been sent from Malak to AJS.

30. On or about February 21, 2024, one 5A3307-701 was sent from AJS to Malak in Dubai via a FedEx shipment.

31. Information provided to agents from FedEx revealed that on February 22, 2024 this shipment passed through the FedEx World Hub in Memphis, Tennessee prior to leaving the US. On February 26, 2024, the shipment was delivered to Malak at their offices in Dubai.

32. On March 12, 2024, an email was sent from Pobeda Airlines to Malak confirming they had received one 5A3307-701 from Malak. On March 17, 2024, an employee of Malak sent an email confirming Pobeda Airlines had paid for the 5A3307-701.

33. A review of several email messages and documents found that the 5A3307-701

purchased by Malak from AJS and the 5A3307-701 Malak sold to Pobeda Airlines contained the same serial number.

34. On April 17, 2024, an email was sent from lalla.meryem@malakaviation.aero to several different malakaviation.aero email accounts that stated, "Dear team, For added security during our communications, especially during voice calls, we will be using abbreviated names to safeguard our work." The email went on to list abbreviations for several known Russian airlines or companies involved in shipping parts to Russia. On the same day, an email was sent from finance@airmedaviation.aero to finance@malakaviation.aero discussing a purchase order between the two companies. Copied on this email was mery.boufous@airmedaviation.aero. Agents found several emails in which the name Lalla Meryem Boufous was associated with both lalla.meryem@malakavaition.aero and mery.boufous@airmedaviation.aero. This demonstrates that she was conducting business for both companies on the same day.

35. On March 28, 2025, fifteen months after Boufous claimed he sold Malak, an email was sent to lalla.meryem@malakaviation.aero from an aircraft maintenance company located in Russia inquiring about the status of a requested item. On the same day, lalla.meryem@malakaviation.aero forwarded the email message to m.moulay@malakaviation.aero, an email address known to be used by Boufous.

36. Further evidence that Malak and Air Med were being operated by the same people was found in information provided by FedEx pursuant to a February 2025 subpoena request. In response to the subpoena, FedEx provided agents with historical data regarding tracking requests made by users via the fedex.com website, specifically for tracking requests related to Malak and Air Med. Among this data was an item referred to by FedEx as a CBID.

37. A CBID is a unique 32-character string installed onto a specific internet browser, on a specific device, when that browser connects to the fedex.com website. CBIDs remain on a browser and device until the user deletes the internet browser history or installs a new internet browser onto the device. A CBID is the same as what is commonly referred to as a "tracking cookie".

38. A review of this data found that between October 2023 and August 2024, 25 separate FedEx parcels shipped to Malak were tracked by CBID number 31214489081698397522282330190391. The device this CBID was placed onto accessed fedex.com through two separate internet service providers located in Dubai.

39. The data also revealed that three separate FedEx parcels shipped to Air Med in July and October 2024 were also tracked by CBID number 31214489081698397522282330190391. This data shows that the same internet browser and device accessing the internet in Dubai was used to track parcels being shipped to both Malak and Air Med.

40. A review of the malakaviation.aero email accounts provided by Google, LLC found extensive communication between Malak and several known Russian air carriers discussing the availability, condition, sale, and shipment of aircraft parts sourced from the United States and ultimately sent to Russia. There was also a large volume of internal emails within Malak discussing the sale and shipment of aircraft parts to entities within Russia. These emails were sent and received before and after Boufous claimed he sold Malak.

41. In the above-mentioned returns, there was an email exchange between logistic@pobeda.aero and Malak on February 6, 2024. Pobeda Airlines is located in Moscow, Russia. Pobeda requested aircraft part number 5A3307-701.

42. Through a 2025 subpoena request to Memphis based company, Inventory Locator

Service ("ILS"), which specializes in selling aviation parts, a request was found from Malak for the same part number on February 8th, 2024.

43.     Information provided by FedEx pursuant to a 2026 subpoena request shows that Atlantic Jet Support shipped a package containing aircraft part number, 5A3307-701 from their location based in Coconut Creek to Malak in Dubai on February 22nd, 2024.

44.     Further, in the review of email accounts provided by Google LLC for malakaviation.aero, an excel table was found for the status of purchase orders dating May 22, 2024. In the table, a row was found stating that Pobeda paid a balance for part number 5AS3307-701 as of March 15, 2024.

45.     A license determination was requested through BIS. Part number 5A3307-701 requires a license to be shipped to Russia. License request records were also conducted through BIS checked with negative results.

46.     This one example demonstrates the process by which Boufous facilitated the purchase of U.S. based aviation parts through Malak and shipped them to Russian based entities.

47.     Further investigation found that in April 2024, Air Med Aviation Inc was established in Florida and listed Boufous as the Signature of Incorporator and Initial Officer for the company.

48.     It is believed that Air Med likely established a presence in the United States in order to more easily obtain aircraft parts from suppliers also located in the United States.  It is common for suppliers to require end user information and more thoroughly scrutinize shipments being exported outside of the United States. Using a facility in the United States to receive parts allows Air Med to become the exporter and ship parts to Dubai with much less scrutiny.

49.     A review of Air Med's website found that the company's listed address is 4121 34th

St, Orlando, FL. This address was determined to be a large facility that contains rented warehouse space for multiple companies. A search of CBP export records found that between July 2025 and November 2025, Air Med used this address to export six separate shipments from the United States to two separate companies in Dubai, one of which is believed to be owned and/or operated by an associate of Boufous.

50. The facility is owned by Portal Warehouse where Air Med rents a space to conduct its business. Your affiant and Special Agent Colby Swift ("Swift") with BIS/Office of Export Enforcement conducted an interview with the manager of the facility who stated that Air Med had been leasing space in the facility since early 2024.

51. During the above-mentioned interview, the facility manager stated that Boufous, the chairman of Air Med, would be in the warehouse the following week on February 27th, 2026.

52. On February 27th, 2026, your Affiant and Swift conducted an interview with Boufous at his Air Med facility. Boufous claimed that he could not speak English very well but was on the phone with a colleague who could translate on his behalf. Boufous stated Air Med had three different locations; one located in Dubai, another in Morocco, and the location in Orlando, Florida. Boufous went on to say that he was aware of the regulations around sanctioned countries and stated that his company does not ship to Russia.

53. Immediately after the interview, Boufous gave your Affiant and Swift a tour of the warehouse space. In the facility, there appeared to be one computer and a number of aircraft parts which Boufous stated needed to be shipped.

54. To date, this investigation has found strong evidence that Malak, under the control of Boufous, is or was involved in the export of aircraft parts from the United States to Russia. Based

on the above information, it is believed Boufous is continuing this activity through the use of Air Med. It is also reasonable to assume that the warehouse space leased from Portal Warehouse located at 4121 34th Street, Orlando, FL 32811 is likely being used to conduct illegal activity.

55. On August 13, 2018, the then-President signed into law the National Defense Authorization Act of 2019, which included the Export Control Reform Act ("ECRA"). *See* Title 50 United States Code, Section 4801 et seq. ECRA provides permanent statutory authority for the Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Sections 730-774.

56. ECRA provides that "the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specified activities of United States persons, wherever located, be controlled." Title 50, United States Code, Section 4811. To that end, ECRA grants the President the authority to "(1) control the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and information. Title 50 United States Code, Section 4812. ECRA grants to the Secretary of Commerce the authority to establish the applicable regulatory framework. Title 50 United States Code, Section 4813.

57. ECRA authorizes the Department of Commerce to review and control the export from the United States of certain items, including goods, software, and technologies. The EAR outlines the regulatory framework as provided by ECRA. In particular, the EAR restrict the export of items that could contribute to the military potential of other nations or that could be detrimental to U.S. foreign policy or national security. The EAR impose licensing and other requirements for

items subject to the EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another.

58.     Through the EAR, BIS reviews and controls the export from the United States to foreign countries of certain items.  In particular, BIS has placed restrictions on the export and reexport of items that BIS has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.  Under the EAR, such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end-user, and the end-use.

59.     The most sensitive items subject to EAR controls are identified on the Commerce Control List, or CCL, set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1.  Items listed on the CCL are categorized by Export Control Classification Number ("ECCN"), each of which have export control requirements depending on destination, end-use, and end-user.  As of April 8, 2022, license requirements for export to Russia were expanded to cover all items on the CCL. *See* 87 Fed. Reg. 12226 (Mar. 3, 2022); 87 Fed. Reg. 22130 (Apr. 14, 2022); 15 C.F.R. § 746.8.

60.     Agents sent the information regarding part number 5A3307-701 to BIS for a license determination.  On March 13, 2026, BIS determined this part was controlled under the EAR and that a DOC license was required to export the part to Russia.

61.     As detailed above, Boufous procured items controlled on the CCL, for which an export license from the DOC is required for the export, or reexport, to Russia of these goods. Neither Boufous, nor any of his affiliated entities, applied for or received a license from the DOC

to ship any controlled items to Russia.

<u>**CONCLUSION**</u>

Based on the above information, your Affiant feels there is probable cause to believe that Moulay Mohamed Boufous did commit the offense of smuggling in violation of Title 18, United States Code, Section 554 and conspiracy to commit that offense in violation of Title 18, United States Code, Section 371 and respectively request that the court issue an arrest warrant.

SETH H THOMPSON

Digitally signed by SETH H THOMPSON
Date: 2026.03.18 09:53:22 -05'00'

Seth Thompson
Special Agent
U.S. Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Ped. R. Crim. P. 4.1 on March 18, 2026.

**/s/ Charmiane G. Claxton**
12:17 PM, Mar 18, 2026

Charmiane G. Claxton
United States Magistrate Judge
Western District of Tennessee